# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) No. CR-04-120-R |
| | ) |
| WILLIAM A. HAGSTROM, | ) |
| MARK G. DIMITROFF, and | ) |
| MICHAEL N. McDONALD | ) |
| | ) |
| Defendants. | ) |

## O R D E R

On April 3 and 4, 2006, the Court held a *James* hearing to determine whether coconspirators' statements are admissible against the Defendants at trial. *See* F.R.Evid. 801(d)(2); *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir.), *cert. denied*, 513 U.S. 977, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). At the *James* hearing, the Court announced that it would, following the hearing, determine whether the Government had proved by a preponderance of the evidence with respect to each Count of the Superseding Indictment that a conspiracy existed and that the declarant and Defendant(s) against whom the declarations were offered were members of the conspiracy but that the Court would defer its determinations of whether particular statements were made in the course of and in furtherance of the conspiracy, *see United States v. Urena*, 27 F.3d at 1490 (setting out three-pronged test for admissibility of coconspirator statements), until trial, when their admission was sought. This procedure was

agreeable to all parties. The parties produced evidence and have now submitted proposed findings of fact and conclusions of law. The Court now enters its findings of fact and conclusions of law.

## FINDINGS OF FACT

1. UroCor was a national urological laboratory based in Oklahoma City, Oklahoma. It was a certified Medicare provider and the majority of its income came from laboratory tests for Medicare patients. However, UroCor performed laboratory testing for both Medicare and non-Medicare patients referred by client doctors.

2. UroCor went public in May of 1996 and thereafter its stock was publicly traded on NASDAQ. As a public company, UroCor was required to file periodic reports of its financial condition which were audited by a certified accounting firm and those reports were available to the investing public.

3. Defendant William A. Hagstrom was employed by UroCor from October of 1989 through December of 1999. During that time he held the positions of Chairman of the Board, President and Chief Executive Officer.

4. Defendant Mark Dimitroff was employed by UroCor from April of 1990 to November of 1999, holding the positions of Vice President of Sales and Marketing, General Manager and Vice President of New Product and Business Development. Defendant Dimitroff supervised the sales and marketing departments.

5. Defendant Michael McDonald was employed by UroCor from June 1992 through June 1999. During that time, he held the positions of Controller, Assistant Secretary,

Treasurer, Director of Finance, Chief Financial Officer and Director of Financial Projects. Defendant McDonald supervised the accounting department of UroCor until approximately April of 1999.

6.      Lou Carmichael began working for UroCor in 1990 and became Regional Sales Manager in 1994. In approximately February of 1997, she became National Sales Director. In late 1998, she also became Compliance Officer.

7.      Beverly Cormier began working for UroCor in 1992 and became Director of Sales in 1994. She left the employ of UroCor in 1997.

8.      Dr. Stuart Holden is a doctor at Tower Urology and a client of UroCor.

9.      Socrates Choumbakos was the Chief Financial Officer of UroCor until 1997, when Defendant McDonald took over that role. Mr. Chorembakos left UroCor in late 1999.

10.     Larry Compton joined UroCor in 1994 and held the positions of Accounting Manager, Controller and Director of Finance.

11.     The Government alleges that Defendants William A. ("Bill") Hagstrom and Mark Dimitroff, Lou Carmichael, Beverly Cormier, Dr. Stuart Holden and UroCor conspired to pay remuneration directly and indirectly, overtly and covertly, in cash and in kind to doctors to induce them to refer patient specimens for laboratory testing to UroCor, the payment for which testing was made in whole or in part under a federal health care program, specifically Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), all in violation of 18 U.S.C. § 371.

12. The Government alleges that Defendants Bill Hagstrom, Michael N. ("Mike") McDonald, Socrates Choumbakos, Larry Compton and UroCor conspired to commit securities fraud in violations of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, in violation of 18 U.S.C. § 371.

## Count I Findings

13. Defendant Hagstrom developed a "growth model" for investors to measure UroCor's success. Among the factors Hagstrom identified as important to UroCor's success were the number of doctors using UroCor services, the number of products used by client doctors and the ability of UroCor to secure managed care contracts. Hagstrom regularly referred to this model when making disclosures to the public.

14. To accomplish the objectives outlined in Hagstrom's growth model, and specifically to increase the number of doctors using UroCor's services in the early 1990s Defendant Dimitroff developed certain marketing programs, including special pricing, field techs and IRA agreements.

15. Discounts under the "special pricing" program were given to doctors on some laboratory tests. These doctors then billed their patients or the patients' insurance companies for the laboratory tests at prices higher than they paid UroCor for the tests, creating a revenue stream and profits for the doctors. "Special pricing" discounts to doctors were offered by UroCor's sales representatives, known as "Technical Sales Specialists" (TSS). A TSS would obtain a doctor's "payor mix," that is, the number of Medicare patients in a doctor's practice compared to the number of non-Medicare patients. The TSS would then complete a "special

price quote (SPQ)" form which showed how many tests on Medicare patients the doctor would refer to UroCor per month multiplied by the Medicare reimbursement rate and how many tests on non-Medicare patients the doctor would refer to UroCor multiplied by the "special price" and the average price per test for both types of patients. The SPQ forms were sent to a regional manager and the Director of Sales for approval. Many of the earliest SPQ forms were approved by Defendant Dimitroff and Beverly Cormier. Approval of the requested "special price" was dependent on how much Medicare business the doctor would refer to UroCor and whether the price was necessary to meet the price of a competitor laboratory. The TSS, regional managers and coconspirators acted in concert and interdependently to provide the discounted pricing to doctors. Doctors who could refer the larger volumes of Medicare business received the deepest discounts under the "special pricing" program. Some doctors received "special prices" that were below UroCor's cost for performing the test. Defendant Dimitroff, Bev Cormier and Lou Carmichael monitored the doctor's payor mix even after the discount was approved to ensure UroCor was getting the doctor's Medicare business.

16.     Sometime after 1999, the SPQ form was changed to eliminate references to how much Medicare business the doctor would refer. In February of 1997, while Lou Carmichael was Director of Sales, she attended a conference at which she learned that tying discounts to the referral of Medicare business was a violation of law. She asked Dimitroff about UroCor's practice of providing discounts to doctors for the referral of Medicare business. Defendant Dimitroff allayed her concerns and UroCor continued to offer "special

pricing" discounts to doctors even though it was tied to the referral of Medicare business. Lou Carmichael also had discussions with Defendant Hagstrom regarding UroCor's "special pricing" program. In her discussions with both Defendants Dimitroff and Hagstrom, Ms. Carmichael expressed her concerns about the discounts being tied to Medicare business and the low discounts UroCor was approving. Neither Defendant seemed to care. Dimitroff told Carmichael he would check with the lawyers to determine whether UroCor's pricing strategy was permissible. Ms. Carmichael later learned that Defendant Dimitroff had made no such inquiry. Despite her concerns, Ms. Carmichael continued to approve "special pricing" knowing it was wrong and a violation of law.

17. In October of 1994, Defendants Hagstrom and Dimitroff and Bev Cormier and Jackie Vaught received a copy of the Office of Inspector General's "Special Fraud Alert," which stated as follows:

> Whenever a laboratory offers or gives anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business. The same is true whenever a referral source solicits or receives anything of value from the laboratory. By "fair market value" we mean value for general commercial purposes. However, "fair market value" must reflect an arms length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them."

UroCor continued to offer "special pricing" that was tied to the referral of Medicare business until the program was terminated in 2000.

18. The offer of "field techs" was another marketing tool UroCor used to increase the number of doctors using UroCor. Field techs hired and paid by UroCor were placed in

doctors' offices to draw blood and prepare specimens for shipment to UroCor. California practices which had UroCor field techs included Tower Urology and Kaplan & Mitchell. In 1996, the Attorney General of California determined that the placement of laboratory employees in doctors' offices violated the law. As a result of that opinion, UroCor cancelled the field tech program in California and notified the California doctors of same, advising that its "local and regional management representatives will be in contact with you to determine how UroCor can continue to best service your accounts through alternatives to the program."

19.   Defendants Hagstrom and Dimitroff and Doctors Velti and O'Dowd met to discuss offering consulting agreements to the California doctors as an alternative to the field tech program. Lou Carmichael had a conversation with Defendant Dimitroff where he explained that the California business was at risk but that UroCor was going to keep the business by offering consulting agreements to doctors. During that conversation, Ms. Carmichael observed at least six consulting agreements on Dimitroff's credenza in his office. After the conversation with Defendant Dimitroff, Ms. Carmichael had a conversation with Defendant Hagstrom in which she stated "it looks like we're going to be able to keep the California business." Defendant Hagstrom responded, "Yeah, Mark told me about that." Ms. Carmichael was led to believe from her conversation with Defendant Hagstrom that he had a good understanding of what she was talking about.

20.   Tower Urology was an important California account that referred Medicare business to UroCor and had a UroCor field tech until October of 1996. In 1995, UroCor offered Tower Urology a one-year consulting agreement effective in July of 1995.

Defendant Dimitroff signed the consulting agreement on behalf of UroCor, but both Defendants Hagstrom and Dimitroff worked to get the consulting agreement in place. Their primary contact at Tower Urology was Dr. Stuart Holden. UroCor paid Tower Urology $36,000 as contemplated under the 1995 consulting agreement. No work that was to be done by Tower Urology under the 1995 consulting agreement was ever done and UroCor never requested that any of the work be done.

21. In November of 1996, even though there was as of that time no written consulting agreement with Tower Urology for 1996 in place, Defendant Dimitroff authorized the payment to Tower Urology of $9,000, notwithstanding the fact that Dimitroff had received legal advice that all agreements for payment of services provided by a referring doctor must be in writing and the services documented.

22. In November of 1996, UroCor and Tower Urology entered into another written consulting agreement under the terms of which UroCor was to pay Tower Urology $75,000. A third and final consulting agreement between UroCor and Tower Technology was signed in July of 1998.

23. Dr. Stuart Holden of Tower Urology said that he did not provide any services under the terms of the consulting agreements. Dr. Leff, a California doctor at San Fernando Valley Urological, had a UroCor field tech. Dr. Leff said that UroCor offered him a consulting agreement after the field tech program was cancelled. He received $3,700 from UroCor and provided no services contemplated under the consulting agreement. After the

Department of Justice issued the first Civil Investigative Demand, Defendant Dimitroff told Ms. Carmichael, "we're going to have trouble with these consulting agreements."

## **Count II Findings**

24. Defendant Hagstrom ran UroCor through sales and marketing and had tight control and knowledge concerning UroCor's financials. He also had tight control over reporting to the public through quarterly telephone conference calls, press releases, financial reporting, and SEC filings and took the lead in reporting to UroCor's board of directors. Defendant McDonald reviewed and edited SEC filings; gave directions for disclosure concerning accounts receivable and other financial information; participated with Hagstrom and others in quarterly conference calls with investors; oversaw the billing and accounts receivable departments; and was the point of contact for the Arthur Anderson auditors.

25. In an effort to increase revenues, gain business from doctors and try to get more managed care contracts, the sales and marketing department of UroCor, under the direction of Defendants Hagstrom and Dimitroff, implemented a program to get all the lab business from doctors with growing health care business. The early version of this program was implemented through "HMO agreements" and "90-day managed care agreements." In December of 1996, the name was changed to "Insurance Reimbursement Assessment (IRA)" agreements. The IRA was described to doctors as a program by UroCor to allow doctors to send all their lab business to one place while UroCor tried to secure more managed care contracts from the doctors' patients' providers. Doctors were told that for a period of up to 180 days, for all patients they referred for lab testing who had insurance with managed care

companies with whom UroCor was "out-of-network" (i.e., did not have a contract with the provider), UroCor would accept as payment in full the amount paid, if any, by the managed care companies and the doctors' patients would not be billed for the patient balances or the out-of-network co-payments and deductibles and that those amounts would be written off on UroCor's books. IRA agreements were signed by doctors and approved by regional sales managers and the Director of Sales.

26.     UroCor booked the full amounts of the list prices for laboratory tests performed on IRA agreement patients as revenue. UroCor would file claims with the patient's managed care providers, receive payment or denial of charges from the managed care providers and then allow the balances they never intended to collect to remain on the books. By November of 1997, UroCor had entered into 188 IRA agreements and had approximately $16,000,000 in accounts receivable of which 65 percent was over 90 days old.

27.     UroCor did not monitor amounts received from patients' providers for which they were out of network or follow-up with the managed care organizations to attempt to obtain contracts with them. However, the IRA agreements were not terminated after 180 days because they were valuable to UroCor. None of the IRA agreements were cancelled until April of 1999.

28.     The IRA agreements created a problem in UroCor's accounts receivable that persisted for years. The failure of Defendants to write off balances that they never intended to collect was also contrary to UroCor's revenue recognition policy as publicly reported in

SEC filings, which stated that "revenue subject to Medicare or third-party reimbursement is recorded at estimated reimbursable amounts."

29. By September of 1998, the accounts receivable of UroCor grew to $20,000,000 and the accounts receivable balance attributable to the IRA agreements was $7,300,000.

30. After UroCor employees in billing and accounting complained about the burdens of placing IRA patient statements on "hold" so that they would not be sent, Defendant McDonald implemented procedures to ensure that patient bills were never sent. Neither Defendant Hagstrom nor Defendant McDonald was receptive or responsive to complaints from employees that accounts receivable were growing out of control.

31. The use of IRA agreements and the practice of booking the full list prices of lab tests performed pursuant to the IRA agreements as accounts receivable and revenue and not writing off balances UroCor never intended to bill for or collect permitted Defendants Hagstrom and McDonald to publicly report artificially inflated revenues and accounts receivable fraudulently booked as assets of UroCor.

32. When problems with growing accounts receivable at UroCor and the Days Sales Outstanding (DSO) were raised by employees of UroCor, the Financial Relations Board, UroCor's Board of Directors and/or the Arthur Anderson auditors, Defendants Hagstrom and McDonald and Socrates Choumbakos and Larry Compton, acting in concert and interdependently, made a series of false statements and misrepresentations to respond to these concerns. Some of the false statements and misrepresentations that Defendants and the coconspirators offered as explanations for these problems were 1) certain payers were getting

slower to pay claims, 2) the computer system was antiquated and inefficient, 3) there were operational challenges causing billings to go out late, 4) these problems were just due to the growth of UroCor's business, and 5) there were no pervasive reimbursement problems concerning the accounts receivable.

33. In addition to using IRA agreements to inflate company financials, Defendants Hagstrom and McDonald and Choumbakos and UroCor allowed other accounts receivable to remain on the books as an asset of UroCor that were well beyond the age of collectibility. By December of 1997, Duane McKown, then accounts receivable manager, had identified many problems with accounts receivable, including that 65 percent of total receivables of $16 million was over 90 days old and that there was over $3.7 million in IRA accounts receivable. When McKown confronted Defendants Hagstrom and McDonald about the large uncollected debt and possible inaccurate revenue reporting, they told him they knew about the revenue shortfall but needed to show higher revenues and also told him that the ambiguous nature of the financial statements was to help the financials look credible to the shareholders. According to Socrates Choumbakos, receivables over 120 days old are considered in the "red zone" of potential uncollectibility and must be analyzed for adequate reserves. Yet, as with IRA revenues and receivables, Defendants Hagstrom and McDonald and their coconspirators permitted uncollectible assets to remain on the books for years and to be reported publicly to fraudulently inflate UroCor's financial picture. They falsely informed the public, UroCor's Board of Directors and investors that they were making efforts to collect these balances and expected to receive all of the receivables. Hagstrom and

McDonald also falsely claimed publicly that they were "not aware of any pervasive reimbursement issues or denials of reimbursement."

34.     When Arthur Anderson auditors and the UroCor Board of Directors in 1997 and 1998 attempted to get management of UroCor to identify the true age of receivables which were "over 90 days old" and take appropriate write-offs, they were met by more false statements and inaction by Defendants and their coconspirators.  Defendant McDonald and Larry Compton represented to the auditors in January of 1998 that they were unable to age receivables past 90 days, when they and others at UroCor knew that UroCor had had that capability for several years.  When Defendant Hagstrom was asked by Mike George, who became President of UroCor in August of 1998, why Hagstrom was not informing the Board of Directors of the progress being made in accounts receivable, Defendant Hagstrom told him that to do so, "we have to admit that there was a problem there in the first place."

35.     If the Defendants had provided truthful aging information to the public, the auditors and UroCor's Board of Directors, it would have revealed that a majority of the accounts receivable had been on the books for years (many over 540 days old), that they were uncollectible, that many of the accounts receivable were not really accounts receivable because Defendants and the coconspirators had no intention of billing for them or receiving them, and that the financial statements had been falsely inflated with bogus revenues and receivables.

## Conclusions of Law

1.     To prove the existence of a conspiracy under 18 U.S.C. § 371, the Government must prove the following 1) the existence of an agreement to violate the law; 2) that the Defendants knew the essential objectives of the conspiracy; 3) that the Defendants knowingly and voluntarily participated in the conspiracy; and 4) that interdependence existed among the alleged coconspirators.  *See United States v. Rahseparian*, 231 F.3d 1267, 1272 (10th Cir. 2000), *cert. denied*, 532 U.S. 974, 121 S.Ct. 1609, 149 L.Ed.2d 474 (2001); *United States v. Hanzlicek*, 187 F.3d 1228, 1232 (10th Cir. 1999).

2.     A person violates the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), when he knowingly and willfully offers or pays any remuneration to any person to induce such person to refer an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal healthcare program.  42 U.S.C. § 1320a-7b(b)(2); *United States v. McClatchey*, 217 F.3d 823, 829 (10th Cir.), *cert. denied*, 531 U.S. 1015, 121 S.Ct. 574, 148 L.Ed.2d 492 (2000).  A violation of the anti-kickback statute occurs when "one purpose of the offer or payment is to induce Medicare or Medicaid patient referrals."  *McClatchey*, 217 F.3d at 835; *accord United States v. Lahue*, 261 F.3d 993, 1003 (10th Cir. 2001), *cert. denied*, 534 U.S. 1083, 122 S.Ct. 819, 151 L.Ed.2d 701 (2002).

3.     A person violates the securities fraud statutes, 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, by 1) knowingly and willfully 2) through the use of instrumentalities of commerce and mails 3) in connection with the purchase or sale of a security, 4) uses a manipulative and deceptive device by a) employing a device, scheme or artifice to defraud, b) making any untrue statement of a material fact or omitting to state a material fact

necessary in order to make the statement, under the circumstances, not misleading, or c) engaging in any act, practice or course of business that operates, or would operate, as a fraud or deceit. *United States v. Peterson*, 101 F.3d 375, 379 (5th Cir. 1996), *cert. denied*, 520 U.S. 1161, 117 S.Ct. 1346, 137 L.Ed.2d 504 (1997).

  4. The gist of a conspiracy is an agreement to violate the law and the commission of an overt act to effect the unlawful agreement; however, "the requisite overt act need not be the substantive offense." *Jordan v. United States*, 370 F.2d 126, 128 (10th Cir.), *cert. denied*, 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 595 (1967). It is not necessary to prove the commission of the substantive offense or that the conspirators knew all the details of the conspiracy. *United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979). "What matters in a conspiracy prosecution is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense." *United States v. Rosa*, 17 F.3d 1531, 1543 (2nd Cir.), *cert. denied*, 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994).

  5. For each alleged conspiracy, the Government must prove that the conspirators agreed to and intended to engage in the conduct prohibited by the underlying offense, either the anti-kickback statute or the securities fraud statutes, but it is not necessary that the Government prove the success of the conspiracy and that the conspirators intentionally committed each essential element of the offense in question. *See United States v. Blair*, 54 F.3d 639, 642 (10th Cir.), *cert. denied*, 516 U.S. 883, 116 S.Ct. 220, 133 L.Ed.2d 151 (1995). Nor does the Government have to prove that the conspirators knew of the law penalizing

their conduct and specifically intended to violate that law. *See id.* Language in *McClatchey, supra*, on which Defendant Dimitroff relies ("purposely intending to violate the law") to argue that the Government must prove that Defendants knew and intended for their conduct to violate the anti-kickback statute is loose language and must be read in conjunction with the statement in *McClatchey* that to act willfully, "a person must specifically intend to do something that the law forbids," *McClatchey* 217 F.3d at 829, that is, he or she must specifically intend to do the acts or engage in the course of conduct that the laws proscribes.

6.    "An agreement constituting a conspiracy may be inferred from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *United States v. Nelson*, 383 F.3d 1227, 1229 (10th Cir. 2004), *quoting United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994), *cert. denied*, 514 U.S. 1055, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995). *See United States v. Dozal*, 173 F.3d 787, 797 (10th Cir. 1999); *United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir.), *cert. denied*, 510 U.S. 1017, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993). Guilty knowledge may be inferred from the surrounding circumstances and it may be presumed that a person acting in furtherance of the conspiracy is a knowing participant therein. *United States v. Dozal*, 173 F.3d at 797.

7.    Coconspirator statements are admissible if the offering party proves and the Court finds by a preponderance of the evidence that 1) a conspiracy existed; 2) the declarant and the defendant were both members of the conspiracy; and 3) the statements were made in the course of and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483

U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Urena*, 27 F.3d at 1490; *United States v. James*, 590 F.2d 575, 582 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2336, 61 L.Ed.2d 283 (1979).

8.  In this case, the Government has proved by a preponderance of the evidence that a conspiracy to do the acts proscribed by the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2), existed and that Defendants William A. Hagstrom and Mark G. Dimitroff and Lou Carmichael, Beverly Cormier, Dr. Stuart Holden and UroCor, the corporation, were members of the conspiracy, that is, that they knowingly and willfully entered into an agreement with the specific intent to offer or pay remuneration to doctors, one purpose of which was to induce the referral of laboratory tests on Medicare patients.

9.  The Government has proved by a preponderance of the evidence that a conspiracy to commit the acts that constitute securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, existed and that Defendants William A. Hagstrom and Michael McDonald and Socrates Choumbakos, Larry Compton and UroCor, the corporation, were members of the conspiracy, that is, that they knowingly and willfully entered into an agreement with the specific intent to employ the IRA agreements to fraudulently overstate UroCor's revenues and accounts receivable, to engage in the reporting of patient balances which they never intended to bill for or collect and which were uncollectible as accounts receivable which would operate as a fraud upon stockholders, investors and the public and to make untrue statements of material facts and omit to state

material facts[1] necessary to make statements made not misleading concerning the IRA agreements, and accounts receivable and revenues of UroCor.

10.     Upon proof by a preponderance of the evidence by the Government at trial that a statement of a coconspirator was made in the course of and in furtherance of the conspiracy in question, the statement of that coconspirator will be admissible against the other members of the subject conspiracy.

**It is so ordered this 5th day of May, 2006.**

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[1] It is not necessary for the Government to prove that the conspirators succeeded in committing securities fraud or, in particular, that the allegedly untrue statements and omissions were of facts which were material; only that the coconspirators intended to commit securities fraud or, in particular, to make false statements of and omit to state facts which were material. In any event, however, false statements of fact concerning millions of dollars of accounts receivable and revenues and omissions of the fact that millions of dollars of accounts receivable and revenues are not collectible, not likely to be collected and/or not even accounts receivable are material.